# HANOVER SHOE, INC. *v.* UNITED SHOE MACHINERY CORP.

No. 335.   Argued March 5, 1968.—Decided June 17, 1968.*

---

*Together with No. 463, *United Shoe Machinery Corp.* v. *Hanover Shoe, Inc.*, also on certiorari to the same court.

*James V. Hayes* argued the cause for petitioner in No. 335 and respondent in No. 463.   With him on the briefs were *Breck P. McAllister* and *Robert F. Morten.*

*Ralph M. Carson* argued the cause for respondent in No. 335 and petitioner in No. 463. With him on the briefs were *Robert D. Salinger, Philip C. Potter, Jr.,* and *Roland W. Donnem.*

MR. JUSTICE WHITE delivered the opinion of the Court.

Hanover Shoe, Inc. (hereafter Hanover) is a manufacturer of shoes and a customer of United Shoe Machinery Corporation (hereafter United), a manufacturer and distributor of shoe machinery. In 1954 this Court affirmed the judgment of the District Court for the District of Massachusetts, 110 F. Supp. 295 (1953), in favor of the United States in a civil action against United under § 4 of the Sherman Act, 26 Stat. 209, 15 U. S. C. § 4. *United Shoe Machinery Corp.* v. *United States,* 347 U. S. 521. In 1955, Hanover brought the present treble-damage action against United in the District Court for the Middle District of Pennsylvania. In 1965 the District Court rendered judgment for Hanover and awarded trebled damages, including interest, of $4,239,609, as well as $650,000 in counsel fees. 245 F. Supp. 258. On appeal, the Court of Appeals for the Third Circuit affirmed the finding of liability but disagreed with the District Court on certain questions relating to the damage award. 377 F. 2d 776 (1967). Both Hanover and United sought review of the Court of Appeals' decision, and we granted both petitions. 389 U. S. 818 (1967).

## I.

Hanover's action against United alleged that United had monopolized the shoe machinery industry in violation of § 2 of the Sherman Act; that United's practice of leasing and refusing to sell its more complicated and important shoe machinery had been an instrument of the unlawful monopolization; and that therefore Han-

over should recover from United the difference between what it paid United in shoe machine rentals and what it would have paid had United been willing during the relevant period to sell those machines.

Section 5 (a) of the Clayton Act, 38 Stat. 731, as amended, 69 Stat. 283, 15 U. S. C. § 16 (a), makes a final judgment or decree in any civil or criminal suit brought by the United States under the antitrust laws "prima facie evidence . . . as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto . . . ." Relying on this provision, Hanover submitted the findings, opinion, and decree rendered by Judge Wyzanski in the Government's case as evidence that United monopolized and that the practice of refusing to sell machines was an instrument of the monopolization. United does not contest that prima facie weight is to be given to the judgment in the Government's case. It does, however, contend that Judge Wyzanski's decision did not determine that the practice of leasing and refusing to sell was an instrument of monopolization. This claim, rejected by the courts below, is the threshold issue in No. 463. If the 1953 judgment is not prima facie evidence of the illegality of the practice from which Hanover's asserted injury arose, then Hanover, having offered no other convincing evidence of illegality, should not have recovered at all.[1]

Both the District Court and the Court of Appeals concluded that the lease only policy had been held illegal in

---

[1] Following the District Court's rejection of United's construction of Judge Wyzanski's opinion and decree, United filed a motion requesting that the District Court certify the question of construction to Judge Wyzanski. United contends that the District Court erred in denying this motion, but we need not pass upon the merits of United's novel request, for the District Court clearly acted within its proper discretion in denying as untimely certification to another court of a question upon which it had already ruled.

the Government's suit. We find no error in that determination. It is true that § 4 of the decree [2] on which United relies condemned only certain clauses in the standard lease and that nowhere in the decree was any other aspect of United's leasing system expressly described or characterized as illegal monopolization. It is also arguable that § 5 of the decree, which required that United thenceforward not "offer for lease any machine type, unless it also offers such type for sale," was included merely to insure an effective remedy to dissipate the accumulated consequences of United's monopolization. We are not, however, limited to the decree in determining the extent of estoppel resulting from the judgment in the Government's case. If by reference to the findings, opinion, and decree it is determined that an issue was actually adjudicated in an antitrust suit brought by the Government, the private plaintiff can treat the outcome of the Government's case as prima facie evidence on that issue. See *Emich Motors Corp.* v. *General Motors Corp.*, 340 U. S. 558, 566–569 (1951).

Section 5 of the decree would have been a justifiable remedy even if the practice it banned had not been instrumental in the monopolization of the market. But in our view the trial court's findings and opinion put on firm ground the proposition that the Government's case involved condemnation of the lease only system as such. In both its opinion with respect to violation and its opinion with respect to remedy, the court not only dealt with the objectionable clauses in the standard

---

[2] "4. All leases made by defendant which include either a ten-year term, or a full capacity clause, or deferred payment charges, and all leases under which during the life of the leases defendant has rendered repair and other service without making them subject to separate, segregated charges, are declared to have been means whereby defendant monopolized the shoe machinery market." 110 F. Supp., at 352.

lease but also addressed itself to the consequences of
only leasing machines and to the manner in which that
practice related to the maintenance of United's monopoly
power.[3]   These portions of the court's opinion are well
supported by its findings of fact, which also estop United
as against the Government and which therefore consti-
tute prima facie evidence in this case.   We have set out
the relevant findings in an Appendix to this opinion.
They are themselves sufficient to show that the lease
only system played a significant role in United's monop-
olization of the shoe machinery market.   Those findings
were not limited to the particular provisions of United's

---

[3] In its opinion on remedy, in answering United's objection to its
conclusion that the decree should require United to offer machines
for sale as well as for lease, the court plainly said that United "has
used its leases to monopolize the shoe machinery market.   And if
leasing continues without an alternative sales system, United will
still be able to monopolize that market."   110 F. Supp., at 350.
Clearly, if after purging the leases of objectionable clauses United
would still be monopolizing by leasing but not selling its machines,
the lease only policy must also have made a substantial contribu-
tion to United's monopolization of the market during the period
prior to the entry of the judgment.   Moreover, in its opinion on
violation, where the three principal sources of United's market power
were identified, the court pointed to "the magnetic ties inherent
in its system of leasing, and not selling, its more important machines"
and to the " 'partnership' " aspects of leasing but not selling those
machines.   110 F. Supp., at 344.   The leases assured "closer and
more frequent contacts between United and its customers than
would exist if United were a seller and its customers were buyers."
Id., at 343.   A shoe manufacturer by leasing was "deterred more
than if he owned that same United machine, or if he held it on a
short lease carrying simple rental provisions and a reasonable
charge for cancelation before the end of the term."   Id., at 340.
The lease system had "aided United in maintaining a pricing system
which discriminates between machine types," id., at 344, discrimina-
tion which the court later said had evidenced "United's monopoly
power, a buttress to it, and a cause of its perpetuation . . . ."   Id.,
at 349.

leases. They dealt as well with United's policy of leasing but not selling its important machines, with the advantages of that practice to United, and with its impact on potential and actual competition. When the applicable standard for determining monopolization under § 2 is applied to these facts, it must be concluded that the District Court and the Court of Appeals did not err in holding that United's practice of leasing and refusing to sell its major machines was determined to be illegal monopolization in the Government's case.[4]

## II.

The District Court found that Hanover would have bought rather than leased from United had it been given the opportunity to do so.[5] The District Court determined that if United had sold its important machines, the cost to Hanover would have been less than the rental paid for leasing these same machines. This difference in cost, trebled, is the judgment awarded to Hanover in the District Court. United claims, however, that Hanover suffered no legally cognizable injury, contending

---

[4] In its brief on appeal from the judgment and decree rendered in the Government's case, United recognized that "[t]he principal practices which the [District] Court stressed were that defendant offered important complicated machines only for lease and not for sale and that defendant serviced the leased machines without a separate charge." Brief for Appellant 6, *United Shoe Machinery Corp.* v. *United States,* 347 U. S. 521 (1954). United also said that "[e]vidently the Court below regarded the fact that United distributes its more important machines only by lease and not by sale as the basic objection to the system." *Id.,* at 170.

[5] The Court of Appeals affirmed this finding and we do not disturb it. See also n. 16, *infra.* We also agree with the courts below that in the circumstances of this case it was unnecessary for Hanover to prove an explicit demand during the damage period. See *Continental Ore Co.* v. *Union Carbide & Carbon Corp.,* 370 U. S. 690, 699 (1962).

that the illegal overcharge during the damage period was reflected in the price charged for shoes sold by Hanover to its customers and that Hanover, if it had bought machines at lower prices, would have charged less and made no more profit than it made by leasing. At the very least, United urges, the District Court should have determined on the evidence offered whether these contentions were correct. The Court of Appeals, like the District Court, rejected this assertion of the so-called "passing-on" defense, and we affirm that judgment.[6]

Section 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15, provides that any person "who shall be injured

[6] The chronology of events with respect to this issue in the lower courts was as follows: After the pretrial conference, a separate issue which was thought might determine the action was set for trial pursuant to Fed. Rule Civ. Proc. 42 (b). The general question was whether, assuming that Hanover had paid illegally high prices for machinery leased from United, Hanover had passed the cost on to its customers, and if so whether it had suffered legal injury for which it could recover under the antitrust laws. After evidence had been taken on the issue, Judge Goodrich, sitting by designation, ruled that when Hanover had been forced to pay excessive prices for machinery leased from United, it had suffered a legal injury: "This excessive price is the injury." 185 F. Supp. 826, 829 (D. C. M. D. Pa. 1960). He also rejected the argument "that the defendant is relieved of liability because the plaintiff passed on its loss to its customers." *Ibid.* In his view it was unnecessary to determine whether Hanover had passed on the illegal burden because Hanover's injury was complete when it paid the excessive rentals and because " '[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step' " and to exonerate a defendant by reason of remote consequences. *Id.,* at 830 (quoting from *Southern Pacific Co.* v. *Darnell-Taenzer Lumber Co.,* 245 U. S. 531, 533 (1918)). The Court of Appeals heard an interlocutory appeal pursuant to 28 U. S. C. § 1292 (b) and affirmed. 281 F. 2d 481 (C. A. 3d Cir. 1960). Certiorari was denied. 364 U. S. 901 (1960). United preserved the issue and presented it again to the Court of Appeals in appealing the treble-damage judgment entered after trial of the main case. The Court of Appeals adhered to the principles of its prior decision. United brought the question here.

in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained . . . ." We think it sound to hold that when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4.

If in the face of the overcharge the buyer does nothing and absorbs the loss, he is entitled to treble damages. This much seems conceded. The reason is that he has paid more than he should and his property has been illegally diminished, for had the price paid been lower his profits would have been higher. It is also clear that if the buyer, responding to the illegal price, maintains his own price but takes steps to increase his volume or to decrease other costs, his right to damages is not destroyed. Though he may manage to maintain his profit level, he would have made more if his purchases from the defendant had cost him less. We hold that the buyer is equally entitled to damages if he raises the price for his own product. As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower.

Fundamentally, this is the view stated by Mr. Justice Holmes in *Chattanooga Foundry & Pipe Works* v. *City of Atlanta*, 203 U. S. 390 (1906), where Atlanta sued the defendants for treble damages for antitrust violations in connection with the city's purchases of pipe for its waterworks system. The Court affirmed a judgment in favor of the city for an amount measured by the difference between the price paid and what the market or fair price would have been had the sellers not com-

bined, the Court saying that the city "was injured in its property, at least, if not in its business of furnishing water, by being led to pay more than the worth of the pipe. A person whose property is diminished by a payment of money wrongfully induced is injured in his property." *Id.*, at 396. The same approach was evident in *Thomsen* v. *Cayser*, 243 U. S. 66 (1917), another treble-damage antitrust case.[7] With respect to overcharge cases arising under the transportation laws, similar views were expressed by Mr. Justice Holmes in *Southern Pacific Co.* v. *Darnell-Taenzer Lumber Co.*, 245 U. S. 531, 533 (1918), and by Mr. Justice Brandeis in *Adams* v. *Mills*, 286 U. S. 397, 406–408 (1932). In those cases the possibility that plaintiffs had recouped the overcharges from their customers was held irrelevant in assessing damages.[8]

---

[7] "It is, however, contended that even if it be assumed the facts show an illegal combination, they do not show injury to the plaintiffs by reason thereof. The contention is untenable. Section 7 of the act gives a cause of action to any person injured in his person or property by reason of anything forbidden by the act and the right to recover three-fold the damages by him sustained. The plaintiffs alleged a charge over a reasonable rate and the amount of it. If the charge be true that more than a reasonable rate was secured by the combination, the excess over what was reasonable was an element of injury. *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, 436. The unreasonableness of the rate and to what extent unreasonable was submitted to the jury and the verdict represented their conclusion." 243 U. S., at 88.

[8] *Southern Pacific Co.* v. *Darnell-Taenzer Lumber Co.*, 245 U. S. 531 (1918), involved an action for reparations brought by shippers against a railroad. The shippers alleged exaction of an unreasonably high rate. To the claim that the shippers should not recover because they were able to pass on to their customers the damage they sustained by paying the charge, the Court said that the answer was not difficult:

"The general tendency of the law, in regard to damages at least, is not to go beyond the first step. As it does not attribute remote

United seeks to limit the general principle that the
victim of an overcharge is damaged within the meaning
of § 4 to the extent of that overcharge.  The rule, United
argues, should be subject to the defense that economic

consequences to a defendant so it holds him liable if proximately
the plaintiff has suffered a loss.  The plaintiffs suffered losses to
the amount of the verdict when they paid.  Their claim accrued
at once in the theory of the law and it does not inquire into later
events. . . .  The carrier ought not to be allowed to retain his
illegal profit, and the only one who can take it from him is the
one that alone was in relation with him, and from whom the carrier
took the sum. . . .  Probably in the end the public pays the
damages in most cases of compensated torts."  245 U. S., at 533–534.
*Adams* v. *Mills,* 286 U. S. 397 (1932), is to the same effect.  See
also *I. C. C.* v. *United States,* 289 U. S. 385 (1933).

*Keogh* v. *Chicago & N. W. R. Co.,* 260 U. S. 156 (1922), is relied
upon by United as stating a contrary rule.  There the Court affirmed
a judgment on the pleadings in a shipper's action under the antitrust
laws charging a conspiracy among railroads to set unreasonably high
rates.  Because the rates had been approved as reasonable after a
proceeding before the Interstate Commerce Commission, the shipper
was held to have no cause of action under the antitrust laws.  After
giving this and other reasons for its judgment, the Court ended its
opinion by saying that it would have been impossible for the shipper
to have proved damages since no court could say that if the rate had
been lower the shipper would have enjoyed the difference; the benefit
might have gone to his customers.  The Court, however, was careful
to say earlier in its opinion that the result would have been different
had the rate been unreasonably high, an approach confirmed by
Mr. Justice Brandeis in *Adams* v. *Mills, supra.*  We ascribe no
general significance to the *Keogh* dictum for cases where the plain-
tiff is free to prove that he has been charged an illegally high price.
It should also be noted that the Court, in speaking of the impossi-
bility of proving damages, indicated no intention to preclude recovery
in cases such as *Chattanooga Foundry* or *Thomsen* v. *Cayser, supra.*

That is where the matter stood in this Court when the issue came
to be pressed with some regularity in the lower federal courts in
treble-damage suits brought by customers of vendors who were
charged with violating the Sherman Act by price fixing or monop-
olization.  Some courts sustained the defense, both where the
plaintiff complained of overcharging for materials or services used by

circumstances were such that the overcharged buyer could only charge his customers a higher price *because* the price to him was higher. It is argued that in such circumstances the buyer suffers no loss from the overcharge. This situation might be present, it is said, where the overcharge is imposed equally on all of a buyer's competitors and where the demand for the buyer's product is so inelastic that the buyer and his competitors could all increase their prices by the amount of the cost increase without suffering a consequent decline in sales.

We are not impressed with the argument that sound laws of economics require recognizing this defense. A wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether,

---

him to produce his own product, *e. g., Wolfe* v. *National Lead Co.,* 225 F. 2d 427 (C. A. 9th Cir.), cert. denied, 350 U. S. 915 (1955), and where the price fixing concerned articles purchased for resale, *e. g., Miller Motors, Inc.* v. *Ford Motor Co.,* 252 F. 2d 441 (C. A. 4th Cir. 1958); *Twin Ports Oil Co.* v. *Pure Oil Co.,* 119 F. 2d 747 (C. A. 8th Cir.), cert. denied, 314 U. S. 644 (1941). Others, beginning with Judge Goodrich's 1960 decision in the case before us, deemed it irrelevant that the plaintiff may have passed on the burden of the overcharge. Recently, for example, the defense was rejected in the cases brought against manufacturers of electrical equipment by local utilities who purchased equipment at unlawfully inflated prices and used it to produce electricity sold to the ultimate consumer. *E. g., Atlantic City Electric Co.* v. *General Electric Co.,* 226 F. Supp. 59 (D. C. S. D. N. Y.), interlocutory appeal refused, 337 F. 2d 844 (C. A. 2d Cir. 1964).

Concerning the passing-on defense generally, see Clark, The Treble Damage Bonanza: New Doctrines of Damages in Private Antitrust Suits, 52 Mich. L. Rev. 363 (1954); Pollock, Standing to Sue, Remoteness of Injury, and the Passing-On Doctrine, 32 A. B. A. Antitrust L. J. 5 (1966); Note, Private Treble Damage Antitrust Suits: Measure of Damages for Destruction of All or Part of a Business, 80 Harv. L. Rev. 1566, 1584–1586 (1967).

had one fact been different (a single supply less expensive, general economic conditions more buoyant, or the labor market tighter, for example), he would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in a company's price will have on its total sales. Finally, costs per unit for a different volume of total sales are hard to estimate. Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. Since establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable.[9] On the other hand, it is not unlikely that if the existence of the defense is generally confirmed, antitrust defendants will frequently seek to establish its applicability. Treble-damage actions would often require additional long and complicated proceedings involving massive evidence and complicated theories.

---

[9] The mere fact that a price rise followed an unlawful cost increase does not show that the sufferer of the cost increase was undamaged. His customers may have been ripe for his price rise earlier; if a cost rise is merely the occasion for a price increase a businessman could have imposed absent the rise in his costs, the fact that he was earlier not enjoying the benefits of the higher price should not permit the supplier who charges an unlawful price to take those benefits from him without being liable for damages. This statement merely recognizes the usual principle that the possessor of a right can recover for its unlawful deprivation whether or not he was previously exercising it.

In addition, if buyers are subjected to the passing-on defense, those who buy from them would also have to meet the challenge that they passed on the higher price to *their* customers. These ultimate consumers, in today's case the buyers of single pairs of shoes, would have only a tiny stake in a lawsuit and little interest in attempting a class action. In consequence, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them. Treble-damage actions, the importance of which the Court has many times emphasized, would be substantially reduced in effectiveness.

Our conclusion is that Hanover proved injury and the amount of its damages for the purposes of its treble-damage suit when it proved that United had overcharged it during the damage period and showed the amount of the overcharge; United was not entitled to assert a passing-on defense. We recognize that there might be situations—for instance, when an overcharged buyer has a pre-existing "cost-plus" contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present. We also recognize that where no differential can be proved between the price unlawfully charged and some price that the seller was required by law to charge, establishing damages might require a showing of loss of profits to the buyer.[10]

---

[10] Some courts appear to have treated price discrimination cases under the Robinson-Patman Act as in this category. See, *e. g.*, *American Can Co.* v. *Russellville Canning Co.*, 191 F. 2d 38 (C. A. 8th Cir. 1951); *American Can Co.* v. *Bruce's Juices*, 187 F. 2d 919, opinion modified, 190 F. 2d 73 (C. A. 5th Cir.), petition for cert. dismissed, 342 U. S. 875 (1951).

## III.

The District Court held that Hanover was entitled to damages for the period commencing July 1, 1939, and terminating September 21, 1955. The former date represented the greatest retrospective reach permitted under the applicable statute of limitations, and the latter date was that upon which Hanover filed its suit. In addition to somewhat shortening the forward reach of the damage period,[11] the Court of Appeals ruled that June 10, 1946, rather than July 1, 1939, marked the commencement of the damages period. June 10, 1946, was the date this Court decided *American Tobacco Co.* v. *United States*, 328 U. S. 781, which endorsed the views of the Court of Appeals for the Second Circuit in *United States* v. *Aluminum Co. of America*, 148 F. 2d 416 (1945). In the case before us the Court of Appeals concluded that the decisions in *Alcoa-American Tobacco* fundamentally altered the law of monopolization—that prior to them it was necessary to prove the existence of predatory practices as well as monopoly power, whereas afterwards proof of predatory practices was not essential. The Court of Appeals was also of the view that because in prior litigation United's leases had escaped condemnation as predatory practices illegal under § 1, United's conduct should not be held to have violated § 2 at any time prior to June 10, 1946. 377 F. 2d, at 790. This holding has been challenged, and we reverse it.

---

[11] The Court of Appeals held that Hanover was entitled to damages only up to June 1, 1955, the date upon which Judge Wyzanski approved United's plan for terminating all outstanding leases and converting the lessee's rights to ownership. Because Hanover could have legally required United to convert from leasing to selling as of June 1, 1955, the Court of Appeals held it was not entitled to damages for United's failure to offer machines for sale after that date. This determination has not been challenged in this Court.

The theory of the Court of Appeals seems to have been that when a party has significantly relied upon a clear and established doctrine, and the retrospective application of a newly declared doctrine would upset that justifiable reliance to his substantial injury, considerations of justice and fairness require that the new rule apply prospectively only. Pointing to recent decisions of this Court in the area of the criminal law, the Court of Appeals could see no reason why the considerations which had favored only prospective application in those cases should not be applied as well as in the civil area, especially in a treble-damage action. There is, of course, no reason to confront this theory unless we have before us a situation in which there was a clearly declared judicial doctrine upon which United relied and under which its conduct was lawful, a doctrine which was overruled in favor of a new rule according to which conduct performed in reliance upon the old rule would have been unlawful. Because we do not believe that this case presents such a situation, we have no occasion to pass upon the theory of the Court of Appeals.

Neither the opinion in *Alcoa* nor the opinion in *American Tobacco* indicated that the issue involved was novel, that innovative principles were necessary to resolve it, or that the issue had been settled in prior cases in a manner contrary to the view held by those courts. In ruling that it was not necessary to exclude competitors to be guilty of monopolization, the Court of Appeals for the Second Circuit relied upon a long line of cases in this Court stretching back to 1912. 148 F. 2d, at 429. The conclusion that actions which will show monopolization are not "limited to manoeuvres not honestly industrial" was also premised on earlier opinions of this Court, particularly *United States* v. *Swift & Co.,* 286 U. S. 106, 116 (1932). In the *American Tobacco* case, this Court noted

that the precise question before it had not been previously decided, 328 U. S., at 811, and gave no indication that it thought it was adopting a radically new interpretation of the Sherman Act. Like the Court of Appeals, this Court relied for its conclusion upon existing authorities.[12] These cases make it clear that there was no ac-

---

[12] Although the defendants in *American Tobacco* had been found guilty of conspiracy to restrain trade and of attempt and conspiracy to monopolize as well as of monopolization itself, the grant of certiorari was "limited to the question whether actual exclusion of competitors is necessary to the crime of monopolization under § 2 of the Sherman Act." 324 U. S. 836 (1945). After noting that "§§ 1 and 2 of the Sherman Act require proof of conspiracies which are reciprocally distinguishable from and independent of each other . . . ," 328 U. S., at 788, the Court determined that the jury could have found that the defendants had combined and conspired to monopolize, *id.*, at 797, and that it would be "only in conjunction with such a combination or conspiracy that these cases will constitute a precedent," *id.*, at 798. The Court stated that "[t]he *authorities* support the view that the material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded but that power exists to raise prices or to exclude competition when it is desired to do so," 328 U. S., at 811 (emphasis added), and quoted with approval from *United States* v. *Patten,* 187 F. 664, 672 (C. C. S. D. N. Y. (1911)), reversed on other grounds, 226 U. S. 525 (1913), that for there to be monopolization "[i]t is not necessary that the power thus obtained should be exercised. Its existence is sufficient." The Court also said:

"A correct interpretation of the statute *and of the authorities* makes it the crime of monopolizing, under § 2 of the Sherman Act, for parties, as in these cases, to combine or conspire to acquire or maintain the power to exclude competitors from any part of the trade or commerce among the several states or with foreign nations, provided they also have such a power that they are able, as a group, to exclude actual or potential competition from the field and provided that they have the intent and purpose to exercise that power. See *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 226, n. 59 and authorities cited.

"It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It

cepted interpretation of the Sherman Act which conditioned a finding of monopolization under § 2 upon a showing of predatory practices by the monopolist.[13] In neither case was there such an abrupt and fundamental shift in doctrine as to constitute an entirely new rule which in effect replaced an older one. Whatever

is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful." 328 U. S., at 809. (Emphasis added.)

The Court also welcomed the opportunity to endorse, 328 U. S., at 813–814, the following views of Chief Judge Hand in *Alcoa,* 148 F. 2d., at 431–432:

"[Alcoa] insists that it never excluded competitors; but we can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel. Only in case we interpret 'exclusion' as limited to manoeuvres not honestly industrial, but actuated solely by a desire to prevent competition, can such a course, indefatigably pursued, be deemed not 'exclusionary.' So to limit it would in our judgment emasculate the Act; would permit just such consolidations as it was designed to prevent.

.    .    .    .    .

"In order to fall within § 2, the monopolist must have both the power to monopolize, and the intent to monopolize. To read the passage as demanding any 'specific,' intent, makes nonsense of it, for no monopolist monopolizes unconscious of what he is doing."

[13] Any view of the earlier law of monopolization which would attempt, erroneously in our opinion, to find a requirement of predatory practices must rely heavily on certain dicta in *United States* v. *United States Steel Corp.,* 251 U. S. 417, 451 (1920) (Mr. Justice McKenna for a four-to-three Court), and *United States* v. *International Harvester Co.,* 274 U. S. 693, 708 (1927) (Mr. Justice Sanford reiterating the dicta in *U. S. Steel*). The commentators cited by United for the proposition that predatory practices were required prior to *Alcoa-American Tobacco* place major reliance on these dicta. In any event, the cursory and conclusory nature of these writings clearly does not provide sufficiently strong proof of a prevailing opinion as to the law to have permitted the sort of justifiable reliance which alone could generate a prospectivity argument.

development in antitrust law was brought about was based to a great extent on existing authorities and was an extension of doctrines which had been growing and developing over the years. These cases did not constitute a sharp break in the line of earlier authority or an avulsive change which caused the current of the law thereafter to flow between new banks. We cannot say that prior to those cases potential antitrust defendants would have been justified in thinking that then current antitrust doctrines permitted them to do all acts conducive to the creation or maintenance of a monopoly, so long as they avoided direct exclusion of competitors or other predatory acts.[14]

United relies heavily on three Sherman Act cases brought against it or its predecessors by the United States and decided by this Court. United argues that these cases demonstrate both that before *Alcoa-American Tobacco* the law was substantially different and that its leasing practices had been deemed by this Court not to be instruments of monopolization. *United States* v. *Winslow,* 227 U. S. 202 (1913); *United States* v. *United Shoe Machinery Co. of New Jersey,* 247 U. S. 32 (1918); *United Shoe Machinery Corp.* v. *United States,* 258 U. S. 451 (1922). In our opinion, however, United overreads and exaggerates the significance of these three cases. In *Winslow,* the Government charged the three groups of companies which had merged to form United with a violation of § 1. The trial court construed the indictment to pertain only to the merger of the companies and not to business practices which resulted from the merger; most significantly, it excluded United's leasing policies

---

[14] United makes the independent argument that Judge Wyzanski's decision in the Government's case so fundamentally altered the law of monopolization that it should not be held liable for damages prior to the date the decision was handed down, February 18, 1953. We reject this contention for the reasons set forth in the textual discussion of *Alcoa-American Tobacco* and the previous *United* cases.

500

from consideration. The Court specifically stated that "[t]he validity of the leases or of a combination contemplating them cannot be passed upon in this case." 227 U. S., at 217.

The third case, decided in 1922, was brought under § 3 of the Clayton Act rather than § 2 of the Sherman Act. This Court affirmed a decree enjoining United from making leases containing certain clauses, terms, and conditions. Nothing in that case indicates that predatory practices had to be shown to prove a § 2 monopoly charge or that the leases, or the clauses in them which were left undisturbed, would not adequately demonstrate monopolization by an enterprise with monopoly power.

Of the three cases, the 1918 case most strongly supports United. It involved a civil action by the United States charging violations of §§ 1 and 2 of the Sherman Act. The Government contended that United's machinery leases and license agreements had been used to consummate both violations. A three-judge court dismissed the bill and this Court affirmed by a vote of 4 to 3. There is no question but that the leases as they were then constituted were held unassailable under § 1; the reasons for this ruling are not clear. As for the § 2 charge, we cannot read the opinion as specifying what course of conduct would amount to monopolization under § 2 if engaged in by a concern with monopoly power. At most the holding was that the leases themselves did not prove a § 2 charge—did not themselves prove monopoly power as well as monopolization. But the issue in the case before us now is not whether United's leasing system proves monopoly power but whether, once monopoly power is shown, leasing the way United leased sufficiently shows an intent to exercise that power. There is little, if anything, in the 1918 opinion which is illuminating on this issue. Indeed, it may fairly be read as holding that United did not have monopoly power over the market at all, for in rejecting the claim that United's practice of

leasing was illegal when used by a corporation dominant in the market, the Court said:

> "This, however, is assertion and relies for its foundation upon the assumption of an illegal dominance by the United Company that has been found not to exist. This element, therefore, must be put to one side and the leases regarded in and of themselves and by the incentives that induced their execution . . . ." 247 U. S., at 60.

Any comfort United might have received from the 1918 case with respect to the legality of its leasing system when employed by one with monopoly power should have been short-lived. In the third case, which was brought under § 3 of the Clayton Act, and in which all the remaining Justices making up the majority in the 1918 case except Mr. Justice McKenna voted with the Court, the opinion for the Court described the 1918 decision as follows:

> "That the leases were attacked under the former bill as violative of the Sherman Act is true, but they were sustained as valid and binding agreements within the rights of holders of patents." 258 U. S., at 460.

This view was supported by other references to the 1918 opinion which described the question at issue there as being whether United's leases went beyond the exercise of a lawful monopoly.

One might possibly disagree with this reading of the 1918 opinion, but it was an authoritative gloss. After 1922 and after the expiration of the patents on its major machines, there was no sound basis to justify reliance by United on the 1918 case as a definitive pronouncement that its leasing system provided legally insufficient evidence of monopolization, once United's power over the market was satisfactorily shown. The prior cases immunized United's monopoly insofar as it originated

in a merger of allegedly competing companies and perhaps are of some help to United in other respects. But they do not establish either that prior to 1946 there was a well-defined interpretation of the Sherman Act which was abruptly overruled in *Alcoa-American Tobacco* or that United's leasing system could not be considered an instrument for the exercise and maintenance of monopoly power.

In these circumstances, there is no room for argument that Hanover's damages should reach back only to the date of the *American Tobacco* decision. Having rejected the contention that *Alcoa-American Tobacco* changed the law of monopolization in a way which should be given only prospective effect, it follows that Hanover is entitled to damages for the entire period permitted by the applicable statute of limitations.[15]

## IV.

Two questions are raised here about the manner in which damages were computed by the courts below. Hanover argues that the Court of Appeals erred in requiring the District Court, on remand, to take account of the additional taxes Hanover would have paid, had it purchased machines instead of renting them during the years in question. The Court of Appeals evidently

---

[15] United has also advanced the argument that because the earliest impact on Hanover of United's lease only policy occurred in 1912, Hanover's cause of action arose during that year and is now barred by the applicable Pennsylvania statute of limitations. The Court of Appeals correctly rejected United's argument in its supplemental opinion. We are not dealing with a violation which, if it occurs at all, must occur within some specific and limited time span. Cf. *Emich Motors Corp.* v. *General Motors Corp.*, 229 F. 2d 714 (C. A. 7th Cir. 1956), upon which United relies. Rather, we are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm on Hanover. Although Hanover could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955.

felt that since only after-tax profits can be reinvested or distributed to shareholders, Hanover was damaged only to the extent of the after-tax profits that it failed to receive. The view of the Court of Appeals is sound in theory, but it overlooks the fact that in practice the Internal Revenue Service has taxed recoveries for tortious deprivation of profits at the time the recoveries are made, not by reopening the earlier years. See *Commissioner* v. *Glenshaw Glass Co.,* 348 U. S. 426 (1955). As Hanover points out, since it will be taxed when it recovers damages from United for both the actual and the trebled damages, to diminish the actual damages by the amount of the taxes that it would have paid had it received greater profits in the years it was damaged would be to apply a double deduction for taxation, leaving Hanover with less income than it would have had if United had not injured it. It is true that accounting for taxes in the year when damages are received rather than the year when profits were lost can change the amount of taxes the Revenue Service collects; as United shows, actual rates of taxation were much higher in some of the years when Hanover was injured than they are today. But because the statute of limitations frequently will bar the Commissioner from recomputing for earlier years, and because of the policy underlying the statute of limitations—the fact that such recomputations are immensely difficult or impossible when a long period has intervened—the rough result of not taking account of taxes for the year of injury but then taxing recovery when received seems the most satisfactory outcome. The District Court therefore did not err on this question, and the Court of Appeals should not have required a recomputation.

United contends that if Hanover had bought machines instead of leasing them, it would have had to invest its own capital in the machines. United argues that the District Court erred in computing damages because it did not properly take account of the cost of capital to

Hanover. The District Court found that in the years in question Hanover was able to borrow money for between 2% and 2.5% per annum, and that had Hanover bought machines it would have obtained the necessary capital by borrowing at about this rate. It therefore deducted an interest component of 2.5% from the profits it thought Hanover would have earned by purchasing machines. Our review of the record convinces us that the courts below did not err in these determinations; on the basis of the determinations of fact, Hanover's damages were properly computed.[16]

The judgment of the Court of Appeals is affirmed in part and reversed in part, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of these cases.

## APPENDIX TO OPINION OF THE COURT.

Excerpts From Judge Wyzanski's Opinion in *United States* v. *United Shoe Machinery Corp.,* 110 F. Supp. 295, 323–325 (D. Mass. 1953).

*Effects of the Leasing System.*

The effect of United's leasing system as it works in practice may be examined from the viewpoints of United, of the shoe manufacturers, and of competitors potential or actual.

---

[16] United also says that because Hanover's managers would have computed their capital costs differently, they would not in fact have decided to stop leasing machines and to begin purchasing them. The District Court found, however, that Hanover, had it been given the opportunity, would have bought rather than leased the machines offered by United. This finding, affirmed by the Court of Appeals, is supported by the evidence, and we do not disturb it.

For United these are the advantages. (a) United has enjoyed a greater stability of annual revenues than is customary among manufacturers of other capital goods. But this is not due exclusively to the practice of leasing as distinguished from selling. It is attributable to the effects of leasing when, as is the case with United, the lessor already has a predominant share of the market. (b) United has been able to conduct research activities more favorably than if it sold its machines outright. The leasing system, especially the service aspect of that system, has given United constant access to shoe manufacturers and their problems. This has promoted United's knowledge of their problems and has stimulated United's shoe machinery development. This research knowledge would not be diminished substantially if United's service activities covered fewer factories. But if all access to shoe factories were denied the diminution would be of great consequence to research. (c) The steadiness of revenues, attributable, as stated above, not to the leases alone, but to leases in a market dominated by the lessor, has tended to promote fairly steady appropriations to research. But these appropriations declined in the 1929 depression. Research expenditures might or might not be increased if competition were increased. The experience of United when faced with Compo's cement process suggests that declining revenues, no less than steady revenues, may promote research expenditures. (d) United has kept its leased machines in the best possible condition. (e) Under the leasing system United has enjoyed a wide distribution of machinery in a relatively narrow market. But this is merely another way of saying that United's market position, market power, lease provisions, and lease practices give it an advantage over competitors.

Upon shoe manufacturers, United's leasing system has had these effects. It has been easy for a person with modest capital and of something less than superior effi-

ciency to become a shoe manufacturer. He can get machines without buying them; his machines are serviced without separate charges; he can conveniently exchange an older United model for a new United model; he can change from one process to another; and his costs of machinery per pair of shoes produced closely approximate the machinery costs of every other manufacturer using the same machinery to produce shoes by the same process. Largely as a consequence of these factors, there were in 1950, 1,300 factories each having a daily production capacity of 3,000 pairs a day or less; 100 factories each having a capacity of 3,000 to 8,000 pairs; and 40 larger manufacturers. Many of these larger manufacturers, who collectively account for 40% of the shoe production of the United States, started in a small way and flourished under United's leasing system. Moreover the testimony in this case indicates virtually no shoe manufacturers who are dissatisfied with the present system. It cannot be said whether this absence of expressed dissatisfaction is due to lack of actual dissatisfaction, to practical men's preference for what they regard as a fair system, even if it should be monopolistic, or to fear, inertia, or reluctance to testify.

However, while United's system has made it easier to enter the shoe manufacturing industry than to enter many, perhaps most, other manufacturing industries, it has not necessarily promoted in the shoe manufacturing field the goals of a competitive economy and an open society. Without attempting to make findings that are more precise than the evidence warrants, this much can be definitely stated. If United shoe machinery were available upon a sale basis, then—

(a) Some shoe manufacturers would be able to secure credit whether by conditional sales, chattel mortgages, or other devices.

(b) Under such a system, there is no reason to suppose that a purchaser's first installment on a machine would significantly exceed the deposit now often required of a new shoe manufacturer by United.

(c) A few shoe manufacturers would be able to borrow at rates of interest comparable to the interest rates at which United borrows, or raises capital.

(d) Some shoe manufacturers would be able to provide for themselves service at a cost less than the average cost to United of supplying service to all lessees of its machines.

(e) Those manufacturers who bought United machines would not be subject, as are those manufacturers who lease United machines, to the unilateral decision of United whether or not to continue or modify those informal policies which are not written in the leases and to which United is not expressly committed for any specific future period. While there is no evidence that United plans any change in its informal policies, and while United has not heretofore proceeded to alter its informal policies on the basis of its approval or disapproval of individual manufacturers, United has not expressly committed itself to continue, for example, its 1935 plan for return of machines, its right of deduction fund, its waiver for 4 months of unit charges, or its present high standard of service. United's reserved power with respect to these matters gives it some greater degree of psychological, and some greater degree of economic control, than a seller of machinery would have.

(f) Some manufacturers who had bought machinery would find that financial and psychological considerations made them more willing than lessees would be, to dispose of already acquired United machines and to take on competitors' machines in their place.

In looking at United's leasing system from the viewpoint of potential and actual competition, it must be

confessed at the outset, that any system of selling or leasing one company's machines will, of course, impede to some extent the distribution of another company's machines. If a shoe manufacturer has already acquired one company's machinery either by outright purchase, by conditional purchase, or on lease on any terms whatsoever, the existence of that machine in the factory is a possible impediment to the marketing of a competitive machine.

Yet as already noted, a shoe manufacturer may psychologically or economically be more impeded by a leasing than by a selling system. And this general observation is buttressed by a study of features in the United leasing system which have a special deterrent effect. Though these features are stated separately, and some of them alone are important impediments, they must be appraised collectively to appreciate the full deterrent effect.

(a) The 10 year term is a long commitment.

(b) A shoe manufacturer who already has a United leased machine which can perform all the available work of a particular type may be reluctant to experiment with a competitive machine to the extent he would wish. He may hesitate to ask for permission to avoid the full capacity clause. If permission is given for an experimental period he may find the experimental period too short. Thus a competitor may not get a chance to have his machine adequately tried out by a shoe manufacturer. If a shoe manufacturer prefers a competitive machine to a United machine on hand, he may not know the exact rate at which future payments may be commuted. If he knows, he may find that a fresh outlay to make those commuted payments (which admittedly are not solely for revenue but also are for protection against competition, and which admittedly discriminate in favor of a lessee who takes a new United machine and not a competitor's machine) plus the rentals he has already

paid cost him more than if he had bought a similar machine in the first place and were now to dispose of it in trade or in a second-hand market. Thus for a maker of competitive machines he may be a less likely customer than if United had initially allowed him to buy the machine.

(c) United's lease system makes impossible a second-hand market in its own machines. This has two effects. It prevents United from suffering that kind of competition which a second-hand market offers. Also it prevents competitors from acquiring United machines with a view to copying such parts of the machines as are not patented, and with a view to experimenting with improvements without disclosing them to United.

(d) United's practice of rendering repair service only on its own machines and without separate charge has brought about a situation in which there are almost no large scale independent repair companies. Hence when a typical small shoe manufacturer is considering whether to acquire a complicated shoe machine, he must look to the manufacturer of that machine for repair service. And a competitor of United could not readily market such a complicated machine unless in addition to offering the machine he was prepared to supply service. As the experience of foreign manufacturers indicates, this has proved to be a serious stumbling block to those who have sought to compete with United.

(e) If a shoe manufacturer is deciding whether to introduce competitive machines, (either for new operations or as replacements for United machines on which the lease has not expired), he faces the effect of those decisions upon his credit under the Right of Deduction Fund. If he already has virtually all United machines, and if he replaces few of them by competitive machines, the Fund will take care of substantially all his so-called deferred charges, and may cover some of his minimum payments. This is because credit to the Fund earned

by a particular machine enures to the benefit of all leased machines in the factory, and the maximum advantage to the shoe manufacturer is to have a large number of United machines to which the credit can be applied. This advantage to the shoe manufacturer of acquiring and keeping a full line of United machines deters, though probably only mildly, the opportunities of a competing shoe manufacturer.

Mr. Justice Stewart, dissenting.

Hanover sued United under the Clayton Act for damages allegedly flowing from United's practice of offering its machines for lease but not for sale. Hanover did not attempt to prove as an original matter that this practice violated the antitrust laws. Instead, it relied exclusively upon § 5 (a) of the Clayton Act, 38 Stat. 731, as amended, which provides:

> "A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws . . . as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto . . . ." 15 U. S. C. § 16 (a).

Hanover recovered an award of treble damages solely upon the theory that the 1953 judgment and decree in *United States* v. *United Shoe Machinery Corp.,* 110 F. Supp. 295, aff'd *per curiam,* 347 U. S. 521, had established the unlawfulness of United's practice of making its machines available by lease only. So it follows, as the Court says, "[i]f the 1953 judgment is not prima facie evidence of the illegality of the practice from which

Hanover's asserted injury arose, then Hanover, having offered no other convincing evidence of illegality, should not have recovered at all." *Ante,* at 484.

I think that the 1953 judgment did not have the broad effect the Court attributes to it today. On the contrary, that judgment, it seems evident to me, held unlawful only particular kinds of leases with particular provisions, not United's general practice of leasing only.[1]

The only precedent cited by the Court for its expansive application of § 5 (a) is *Emich Motors Corp.* v. *General Motors Corp.,* 340 U. S. 558. That case dealt with the estoppel effect of a general jury verdict in a criminal case. We deal here with a civil case which was tried to a federal judge, who rendered a thoroughly considered opinion and carefully precise decree.

One section of the decree, § 2, broadly set out what the court found United's antitrust violations to be:

> "Defendant violated § 2 of the Sherman Act, 15 U. S. C. A. § 2, by monopolizing the shoe machinery trade and commerce among the several States. Defendant violated the same section of the law by monopolizing that part of the interstate trade and commerce in tacks, nails, eyelets, grommets, and hooks, which is concerned with supplying the demand for those products by shoe factories within the United States. . . ." 110 F. Supp., at 352.

Another section of the decree, § 4, clearly specified the unlawful means by which these antitrust violations had been accomplished, and United's general leasing practice was not one of those means:

> "All leases made by defendant which include either a ten-year term, or a full capacity clause, or deferred

---

[1] I am not alone in this view. See *Cole* v. *Hughes Tool Co.,* 215 F. 2d 924, 932–933; *Laitram Corp.* v. *King Crab, Inc.,* 244 F. Supp. 9, 18. See also n. 2, *infra.*

payment charges, and all leases under which during the life of the leases defendant has rendered repair and other service without making them subject to separate, segregated charges, are declared to have been means whereby defendant monopolized the shoe machinery market." *Ibid.*

In addition to these two sections setting forth the violations found, the decree contained some 20 remedial sections. Section 3 enjoined the violations found in § 2. Section 6 prohibited the particular types of leases found to be unlawful in § 4. Another section of the decree, § 5, went further and provided that in the future United's machines must be offered for sale as well as for lease. But it is a commonplace that "relief, to be effective, must go beyond the narrow limits of the proven violation," *United States* v. *Gypsum Co.*, 340 U. S. 76, 90. *United States* v. *Loew's Inc.*, 371 U. S. 38, 53; *United States* v. *Bausch & Lomb Co.*, 321 U. S. 707, 724.

I can find nothing in Judge Wyzanski's written opinion in the 1953 case to suggest that he found United's lease-only practice, as such, to be a violation of the antitrust laws or illegal in any way.[2] To the contrary, that opinion repeatedly emphasized the anticompetitive effects of the particular types of leases held illegal, and carefully explained that the purpose of requiring that customers

---

[2] Neither, apparently, could Judge Wyzanski. After the trial court in this action filed its opinion holding that the 1953 decree had condemned United's lease-only practice, United applied to Judge Wyzanski for a construction of his decree. While denying the application upon grounds of comity, Judge Wyzanski indicated a willingness to construe his decree if officially requested by the trial judge in the present case, Judge Sheridan. During the course of the hearing before Judge Wyzanski, he made his own views clear to government counsel:

"Now that you are here, are you not aware from being here on previous occasions that the government never contended, and I never ruled, as Judge Sheridan supposes the matter was decided?"

in the future be given an option to purchase was to create an eventual second-hand market in United's machines and to make the machines available to United's competitors, so that they might study and copy them. 110 F. Supp., at 349–350. The opinion specifically stated that the reason for ordering United to offer its machines for sale was *not* to widen the choices available to customers.[3]

The Court today adds as an Appendix to its opinion— like a *deus ex machina*—Judge Wyzanski's findings of fact. But it is irrelevant with respect to § 5 (a) that the 1953 findings describe United's lease-only practice, when neither the decree nor the opinion held that practice to be unlawful.

The real key to why the Court has gone astray in this case is to be found, I think, in the concluding sentence of Part I of the Court's opinion. For there the Court reveals that it is really not trying to determine what Judge Wyzanski decided in 1953, but is determining instead how this Court would decide the issues if the 1953 case were before it as an original matter today.[4]

In my view the 1953 *United Shoe* decision does not establish United's liability to Hanover. I do not reach, therefore, the other questions dealt with in the Court's opinion.

I would reverse the judgment of the Court of Appeals.

---

[3] 110 F. Supp., at 349–350. The language quoted by the Court, *ante,* at 486, n. 3, is not a statement of why the District Court in 1953 ordered United to offer its machines for sale, but rather part of the court's answer to United's argument that it would be unfair to make United sell while its competitors continued only to lease. 110 F. Supp., at 350.

[4] "When the *applicable standard* for determining monopolization under § 2 *is applied to these facts,* it must be concluded that the District Court and the Court of Appeals did not err in holding that United's practice of leasing and refusing to sell its major machines was determined to be illegal monopolization in the Government's case." (Emphasis added.)